UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, EX REL. [UNDER SEAL] | ) ) ) | |
| Plaintiffs, | ) ) ) | **COMPLAINT** |
| [UNDER SEAL] | ) ) ) | JURY TRIAL DEMANDED |
| Defendant | ) ) | |

FILED IN CAMERA AND UNDER SEAL

Steve W. Berman
Jeffrey T. Sprung
Thomas E. Loeser
Shayne C. Stevenson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Ave., Suite 2900
Seattle, WA 98101
Tel: (206) 623-7292
Fax: (206) 623-0594

Jonathan A. Willens (JW-9180)
217 Broadway, Suite 207
New York, N.Y. 10007
Tel: (212) 619-3749
Fax: (800) 879-7938

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA, *ex rel.*
KYLE W. LAGOW,

                Plaintiffs,

          -against-

COUNTRYWIDE FINANCIAL CORPORATION,
COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE-KB HOME LOANS,
COUNTRYWIDE MORTGAGE VENTURES,
LLC, COUNTRYWIDE BANK, FSB,
LANDSAFE, INC., LANDSAFE APPRAISAL
SERVICES, INC., KB HOME, BANK OF
AMERICA CORPORATION, PATRICK AMES,
TODD BAUR, KAY COBB, ANGELO MOZILO,
ROBERT PATRICK, TRACY SANDERSON,
JACK SCHAKETT, RICHARD WENTZ,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No.

COMPLAINT FOR VIOLATIONS
OF THE FALSE CLAIMS ACT

Filed Under Seal Pursuant to 31
U.S.C. § 3730(b)(1)

**TABLE OF CONTENTS**

**PAGE**

I.  INTRODUCTION ................................................................................................1

II.  JURISDICTION AND VENUE ..........................................................................5

III.  PARTIES .............................................................................................................6

IV.  BACKGROUND ..................................................................................................9

A.  The Federal Housing Administration and Mortgage Insurance for Single-Family Homes .............................................................................................................9

B.  HUD's Direct Endorsement Program .................................................................11

1.  Background .............................................................................................11

2.  Legal requirements for lenders participating in the Direct Endorsement mortgage insurance program ...................................................................13

a.  Statutory requirements ................................................................13

b.  Regulatory requirements .............................................................15

(1)  Underwriting requirements ..............................................15

(2)  Appraisal requirements .....................................................15

c.  Lender certifications to induce FHA to approve Direct Endorsement mortgage insurance applications .............................16

d.  Appraisal requirements in HUD Handbooks and Forms submitted to FHA as applicable to Direct Endorsement lenders....................17

V.  ALLEGATIONS ................................................................................................22

A.  Defendants Develop and Implement a National Strategy to Falsely Inflate Home Appraisals Causing False Claims for Payment by the Government......................22

1.  Countrywide becomes a dominant force in the mortgage industry ...........22

2.  Defendants systematically corrupt the underwriting and appraisal process, with an eventual focus on FHA-backed loans ...........................................24

a.  Countrywide's use of LandSafe to implement the fraud ...............25

b.  Mr. Lagow's introduction to Defendants' appraisal fraud.............26

c.  Fraudulent appraisals on home mortgages......................................28

010124-11 299884 V1

|   |   | (1) | Violating underwriter obligations by conspiring with builders and lenders, and the "cherry-picking" of fraudulent appraisers ...........................................................................28 |
|   |   | (2) | Inflating appraisals through undisclosed price concessions33 |
|   | d. | | Intimidation and blacklisting of appraisers who refuse to provide false appraisals to meet predetermined values................................34 |
|   | e. | | Countrywide's manipulation of the Direct Endorsement Underwriter role to further the fraud ...............................................38 |
| B. | | | Relator Communicates the Continuing Fraud to the Highest Levels of Countrywide and LandSafe and Is Terminated ........................................41 |
| C. | | | Defendants' Fraudulent Scheme Has Caused and Continues to Cause False Statements and the Submission of False and/or Fraudulent Claims for Payment to the United States ....................................................................................................43 |

COUNT I FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1) and (a)(2) ......................46

COUNT II FALSE CLAIMS ACT CONSPIRACY 31 U.S.C. § 3729(a)(3).................................47

PRAYER.....................................................................................................................................48

DEMAND FOR JURY TRIAL ....................................................................................................49

010124-11 299884 V1

## I.   INTRODUCTION

1.      This is an action brought by Relator Kyle W. Lagow on behalf of the United States to recover treble damages and civil penalties under the False Claims Act, as amended, 31 U.S.C. § 3729 *et seq.*, ("the FCA" or "the Act") arising from a fraud upon the United States Department of Housing and Urban Development ("HUD") in connection with HUD-insured mortgage loans obtained for the purchase of residential properties located in New York and throughout the United States.

2.      Section 203(b) of the National Housing Act, as amended, 12 U.S.C. §§ 1707, *et seq.*, at § 1709(b), authorizes HUD to insure lenders against losses on mortgage loans made to buyers of single-family homes.  This is commonly referred to as Federal Housing Administration ("FHA") mortgage insurance.  The FHA program is designed to help low-and-moderate-income families become homeowners by lowering or eliminating altogether certain costs associated with mortgage loans and by providing protection to lenders.

3.      Under this mortgage insurance program, if a homeowner fails to make payments on the mortgage loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan (together with interest due and other costs) and assume ownership and possession of the property.  HUD then incurs additional expenses for the management, maintenance, rehabilitation, and marketing of the property until resold.

4.      For this reason, HUD seeks to ensure (and federal law requires) that appraisals reporting values on FHA-backed loans are accurate, and reflect actual market values.  Where appraisals are falsely and pre-textually inflated, FHA ends up insuring a home mortgage under the false pretext that the inflated value is the actual value, thus (1) causing FHA to insure a mortgage loan that does not meet FHA qualifications and (2) requiring FHA, in the event the borrower defaults, to use taxpayer dollars to repay the lender at the fraudulently increased amount of the mortgage loan based on the fraudulent appraisal.  To safeguard public funds,

federal law requires lenders and appraisers to comply with a strict set of guidelines, routinely updated by HUD.

5.     In the vast majority of FHA-backed loans, FHA does not itself directly review each FHA loan application prior to loan issuance. Rather, Congress has allowed HUD to use a so-called Direct Endorsement program ("DE program"). 24 C.F.R. § 203.5. Under the DE program, the lender, in compliance with various rules, regulations and certifications, makes the determination that the property and borrower are eligible for mortgage insurance according to HUD's requirements. Thereafter, the lender causes the loan to be closed and submits the required paperwork to HUD for insurance endorsement.

6.     As with other insured single-family loans, once the mortgage loan is insured, if the homeowner defaults on the loan and the lender forecloses, the lender may submit a claim under which HUD will pay the balance of the loan (together with interest due and other costs) and assume ownership of the property. With the development of mortgage securitization and other related financial vehicles, the actual holder of the mortgage is often an entity other than the originator of the loan, and in those instances the originator was paid by a third party for the value of the FHA-loan, or a bundling of such loans.

7.     Not surprisingly, federal law demands that participating lenders under the DE program comply with a host of regulations designed, in part, to ensure that the Government is not insuring loans in an amount greater than the actual value of the property. This is particularly important in light of the recent downturn in the housing market, and the fact that FHA's share of the U.S. mortgage market rose to nearly one-third of all loans originated in the fourth quarter of 2008. The Government is now insuring an unprecedented proportion of the U.S. mortgage market.

8.     Since at least 2003, Countrywide and its affiliates, who became the dominant players in the mortgage industry during the mortgage boom and real-estate bubble, have continued to corrupt the entire underwriting and appraisal process in direct contravention of

federal law regarding FHA-backed mortgages by causing false, inflated appraisals to be executed. This corruption has led to false claims for payment by the Government on FHA-insured loans that were unlawfully procured, based upon fraudulently inflated appraisals. Defendants sought FHA insurance on the loans Countrywide or its affiliated lenders originated and/or funded. It did so not only to protect itself from foreclosure by borrowers on loans that it held, but also to increase the value of the loans when they were repackaged and sold on the secondary mortgage market.

9.      As Mr. Lagow witnessed first-hand, defendants corrupt the underwriting and appraisal process in a variety of ways, including by, *inter alia*, (a) knowingly and fraudulently inflating, and causing inflation of, property appraisals on, among others, FHA-backed loans, including for use as comparables for other FHA-backed loans; (b) refusing to supply *bona fide* appraisers with HUD-1 documents and other materials necessary for HUD-conforming appraisals; (c) paying above-market fees to those appraisers who inflate values above actual market values; (d) rewarding appraisers who produce appraisals and appraisal reviews at a rate of as many as 400 per month (an impossible volume to produce in conformity with federal law); (e) blacklisting, retaliating against, auditing, and firing appraisers who refuse to corrupt their appraisal reports by fraudulently inflating the value of homes in contravention of federal law; (f) requiring appraisers to rely upon information outside the relevant market to justify inflated valuations in appraisals; (g) providing appraisers with false sales information, not reflecting concessions made by sellers at the time of closing, further corrupting the use of comparables to complete accurate appraisals; (h) allowing home developers to choose appraisers from an "approved list" of corrupted appraisers who will appraise at pre-determined values; (i) violating the loan-to-value rules under HUD, thereby forcing the Government to insure homes at values in excess of their actual market value with loan-to-value ratios in excess of 100%; (j) demanding reviews and reappraisals where those demands are made by persons other than the Direct Endorsement Underwriters (who are exclusively allowed to make such requests under law); (k)

- 3 -

010124-11 299884 V1

knowing and permitting the exchange and sharing of CHUMS identification numbers given to Direct Endorsement Underwriters, thereby allowing persons not authorized to communicate with appraisers to challenge the valuations in appraisal reports; and (l) retaliating against those persons who question or criticize the pattern and practice of defendants to require inflation of *bona fide* appraisals to meet an inflated loan amount where that inflated appraisal does not meet federal requirements and is simply the product of fraud and manipulation.

10.     The elaborate orchestration of underwriting and appraisal corruption by defendants has caused numerous false claims for payment to be made to the Government.   Each claim for payment made to HUD on the basis of a falsely inflated appraisal engineered as such by defendants and their underwriters, constitutes a false claim on the Government.  The support for each claim against HUD for the loan amount in a foreclosure situation is the FHA-insured mortgage, procured falsely by the defendants who knowingly submit loan applications with fraudulent, pretextual, false appraisals and underwriter certifications.

11.     Delinquencies and foreclosures on FHA-backed loans have rapidly accelerated in volume.  According to the Wall Street Journal the rate of FHA-backed foreclosures reached 7.46% in February of this year, including, for example, an FHA-loan default rate of over 10% in certain parts of the United States.  As a result the Government has paid and continues to pay significant sums of money to cover FHA-backed loan obligations that: (1) never qualified for FHA insurance in the first instance given the fraud involved in each application; and (2) were insured at inflated levels, thus requiring the Government to repay lenders at falsely inflated values.

12.     Defendants' actions have helped drain the FHA's insurance fund, a drain noted by HUD Secretary Shaun Donovan last month, and by HUD's Inspector General Kenneth Donovan who is examining now whether a federal bailout of FHA will be necessary given that its reserve fund is nearing just 3% of its loan portfolio, less than half what it was only a year ago, and approaching the 2% minimum required under law.

13.    *Qui tam* plaintiff seeks through this action to recover damages and civil penalties arising from defendants' making or causing to be made false or fraudulent records, statements and/or claims in connection with their knowing corruption of the home mortgage underwriting and appraisal process for FHA-backed loans.  Defendants knew and continue to know that their false and fraudulent appraisal scheme for securing FHA-approval on home mortgages causes the submission of millions of dollars in claims to HUD seeking insurance payments for the outstanding balance on FHA-backed loans.  These loans did not qualify for FHA insurance in the first instance and were fraudulently inflated, thereby causing false payments and payments at falsely inflated levels.

## II.    JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Plaintiff establishes subject matter jurisdiction under 28 U.S.C. § 3730(b).  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint for which Mr. Lagow is not an "original source."

15.    This Court has personal jurisdiction and venue over the defendants pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the defendants have minimum contacts with the United States.  Moreover, the defendants can be found in, reside, transact, or have transacted business in the Eastern District of New York.

16.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the defendants can be found in and transact or have transacted business in the Eastern District of New York.  At all times relevant to this Complaint, defendants regularly conducted substantial business within the Eastern District of New York, and made significant sales within the Eastern District of New York.

## III.   PARTIES

17.    Plaintiff-Relator Kyle W. Lagow is a resident of Plano, Texas. From June 2004 until November 2008, Mr. Lagow was employed by LandSafe, Inc. in Plano, Texas. Mr. Lagow began at LandSafe as one of the company's original supervisory home appraisers. He was promoted to Field Valuation Manager, then Area Manager, and ultimately Assistant Vice President, Area Appraisal Manager. During his tenure at LandSafe, Mr. Lagow had direct exposure to the false statements, records and/or claims made by LandSafe, its affiliate Countrywide Home Loans, and its parent Countrywide Financial. These statements, records and/or claims were made by defendants in order to obtain FHA-mortgage insurance on Countrywide loans that did not comply with FHA guidelines and requirements, and were therefore not qualified for such insurance.

18.    Defendant Countrywide Financial Corporation ("Countrywide Financial") is a Delaware corporation registered to do business throughout the United States. It was at relevant times the publicly traded parent and holding company of the Countrywide family of companies, which have their principal place of business and national headquarters at 4500 Park Granada, Calabasas, County of Los Angeles, California ("Countrywide Headquarters").

19.    Defendant Countrywide Home Loans, Inc. ("Countrywide") is a New York corporation with its principal place of business and national headquarters at Countrywide Headquarters. It was at all relevant times a wholly owned and controlled subsidiary of Countrywide Financial operated out of Countrywide Headquarters.

20.    Defendant Countrywide-KB Home Loans is an unincorporated joint venture between Defendant KB Home and Defendant Countrywide Financial.

21.    Defendant Countrywide Mortgage Ventures, LLC is a Delaware Limited Liability Company formed and registered to conduct business in the State of California. At all relevant times it was a wholly owned and controlled Countrywide Financial subsidiary operated out of Countrywide Headquarters.

- 6 -

22.     Defendant Countrywide Bank FSB ("Countrywide Bank") formerly known as Countrywide Bank, N.A., is a federally chartered savings bank, headquartered in Thousand Oaks, California.

23.     Defendant LandSafe, Inc. ("LandSafe") is a Delaware corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024.  LandSafe is a subsidiary of Countrywide Financial, and purports to provide loan closing products and services such as credit reports, appraisals, property valuation services and flood determinations.

24.     Defendant LandSafe Appraisal Services, Inc. ("LandSafe Appraisal") is a California corporation headquartered at 6400 Legacy Drive, Plano, Texas 75024.  LandSafe Appraisal is a subsidiary of LandSafe, Inc. with shared management and employees, purporting to offer appraisal services in connection with mortgage loan closings.

25.     Collectively, LandSafe and LandSafe Appraisal are referred to as LandSafe.

26.     Defendant KB Home is a Delaware corporation, headquartered nationally at 10990 Wilshire Boulevard, Los Angeles, California.  It is the publicly traded and holding company of the KB Home conglomerate, with sales offices across the United States.

27.     Defendant Bank of America Corporation ("BOA") is a Delaware corporation, a bank holding company, and a financial holding company under United States law.  BOA acquired Countrywide on January 11, 2008.  Its principal executive offices are located at 100 N. Tyron Street, Charlotte, North Carolina.

28.     Defendant Patrick Ames was Senior Vice President of LandSafe's Appraisal Division, answering to President and CEO Todd Baur, during the relevant time period.  Ames was responsible, *inter alia,* for enacting the fraudulent appraisal policies described below.  In this capacity he caused the submission of false claims.

29.     Defendant Todd Baur was President and CEO of LandSafe during the relevant time period, until his recent departure.  Baur was responsible, *inter alia,* for setting the fraudulent

appraisal policies for LandSafe described below.  In this capacity he caused the submission of false claims.

30.     Defendant Kay Cobb was Assistant to Defendant Robert Patrick during the relevant time period.  Cobb was responsible, *inter alia*, for maintaining and assigning appraisal orders for KB Home appraisals.  In this capacity she caused the submission of false claims.

31.     Defendant Angelo Mozilo was Founder and CEO of Countrywide during the relevant time period, until his recent retirement.  Mozilo was responsible, *inter alia*, for ensuring Countrywide's compliance with federal appraisal laws and for development of the fraudulent appraisal scheme described below.  In this capacity he caused the submission of false claims.

32.     Defendant Robert Patrick was a First Vice President of LandSafe during the relevant time period.  Patrick was responsible, *inter alia*, for establishing the infrastructure that implemented the fraudulent appraisal scheme described below.   In this capacity he caused the submission of false claims.

33.     Defendant Tracy Sanderson was a First Vice President of LandSafe during the relevant time period.  Sanderson was responsible, *inter alia*, for implementing the fraudulent appraisal review practices described below.   In this capacity she caused the submission of false claims.

34.     Defendant Jack Schakett was Executive Managing Director and Chief Operations Officer First Vice President of Countrywide during the relevant time period.  Schakett was responsible, *inter alia*, for developing the fraudulent appraisal practices described below.  LandSafe CEO Baur answered to Schakett.  In this capacity he caused the submission of false claims.

35.     Defendant Rick Wentz was a Countrywide Executive Managing Director and Chief Compliance Officer at Countrywide during the relevant time period.  Wentz was responsible, *inter alia*, for working with Schakett to implement the fraudulent appraisal practices described below.  In this capacity he caused the submission of false claims.

010124-11 299884 V1

## IV.   BACKGROUND

**A.     The Federal Housing Administration and Mortgage Insurance for Single-Family Homes**

36.     Congress created the Federal Housing Administration in 1934.  The FHA became a part of HUD's Office of Housing in 1965.

37.     FHA provides mortgage repayment insurance to lending institutions.  FHA's mortgage insurance programs help low-and-moderate-income families become homeowners by lowering some of the costs of their mortgage loans.  FHA mortgage insurance also encourages lenders to make mortgages to otherwise creditworthy borrowers and projects that might not be able to meet conventional underwriting requirements, by protecting the lender against default on mortgages for properties that meet certain minimum requirements.

38.     The FHA's insurance programs have dramatically increased home ownership in the United States.  During the 1940s, FHA programs helped finance military housing and homes for returning veterans.  In the 1950s, 1960s, and 1970s, FHA insurance helped to spark the production of millions of units of privately-owned apartments for elderly, handicapped, and lower income Americans.  When recession prompted private mortgage insurers to pull out of oil-producing states in the 1980s, the FHA moved in to steady falling home prices and made it possible for potential homebuyers to get the financing they needed.

39.     By third quarter 2001, the nation's homeownership rate had soared to an all time high of 68.1 percent.  As of September 2006, FHA and HUD have insured over 34 million home mortgages.  Also as of September 2006, FHA had 4.8 million insured single-family mortgages in its portfolio.

40.     Section 203(b) of the National Housing Act, mentioned above, is the centerpiece of FHA's single-family mortgage insurance programs.  According to FHA, the One- to Four-Family Mortgage Insurance Program remains an important tool with which the federal government expands homeownership opportunities for homebuyers who would not otherwise

010124-11 299884 V1

qualify for conventional mortgages on affordable terms, as well as for those who live in underserved areas where mortgages are harder to get. These obligations are protected by FHA's Mutual Mortgage Insurance Fund.

41.    Section 203(b) has several important features:

–    *Downpayment requirements can be low.* In contrast to conventional mortgage products, which frequently require downpayments of 10% or more of the purchase price of the home, single-family mortgages insured by FHA under Section 203(b) make it possible to reduce downpayments to as little as 3%. This is because FHA insurance allows borrowers to finance approximately 97% of the value of their home purchase through their mortgage, in some cases. As such, FHA requires that the loan-to-value ratio for a qualified loan be no greater than 97%.

–    *Many closing costs can be financed.* With most conventional mortgages, the borrower must pay, at the time of purchase, closing costs equivalent to 2-3% of the price of the home. This program allows the borrower to finance many of these charges, thus reducing the up-front cost of buying a home.

–    *HUD sets limits on the amount that may be insured.* To make sure that its programs serve low-and-moderate-income people, FHA sets limits on the dollar value of the mortgage. The current FHA mortgage limit ranges from $271,050 to $729,750. These figures vary over time and by place, depending on the cost of living and other factors (higher limits also exist for two-to-four-family properties).

42.    To make FHA-insured Section 203(b) mortgages, lending institutions such as banks, mortgage companies, and savings and loan associations must receive approval by FHA.

43.    Anyone intending to use the mortgaged property as their primary residence is eligible to apply for an FHA-insured mortgage through FHA-approved lenders. Applications for FHA mortgage insurance are made through an FHA-approved lending institution. Most lenders who use this mortgage insurance product, however, make their requests through a provision known as Direct Endorsement, which authorizes them to consider applications without first submitting paperwork to HUD.

010124-11 299884 V1

**B.**     **HUD's Direct Endorsement Program**

   **1.     Background**

   44.     HUD's Direct Endorsement program, incorporated into law in 1990, is the most common and fastest way for borrowers to obtain FHA-backed loans by allowing borrowers to obtain mortgage insurance directly from a HUD-approved lender.  24 C.F.R. § 203.5 (regulations for the DE program).  The crux of the DE program is that it removes HUD from reviewing the materials supporting applications for mortgage insurance.  It places that task on lenders that have applied for and been approved by FHA for this unique responsibility.

   45.     Rather than reviewing the technical materials underlying insurance applications, FHA reviews certain forms submitted by the originating lender that contain required certifications of compliance with FHA requirements.

   46.     The Direct Endorsement program is described in HUD Handbook No. 4000.4 REV-1, "Single Family Direct Endorsement Program."  (This handbook was superseded on May 10, 2009 by HUD Handbook No. 4155-2, "Lender's Guide to the Single Family Mortgage Insurance Process."  *See* Mortgagee Letter 2009-14 (April 9, 2009).  The new handbook "incorporate[s] and consolidate[s] the guidance contained in the current Handbooks."  *Id.*)

   47.     As FHA has described it, the purpose of the Direct Endorsement program "is to simplify and expedite the process by which mortgagees can obtain mortgage insurance endorsements from HUD.  Under Direct Endorsement, the mortgagee underwrites and closes the mortgage loan without prior HUD review or approval …. The mortgagee is responsible for underwriting the property and determining that the property is acceptable for mortgage insurance."  HUD Handbook No. 4000.4, §§ 1-1, 1-2.

   48.     The lender undertakes the underwriting responsibilities on HUD's behalf.  A specially approved underwriter for the lender "executes the Underwriter Certification which enables HUD to endorse the mortgage loan without a detailed technical underwriting review.  The underwriter certifies that he has personally reviewed the application documents and finds

compliance with the applicable requirements." HUD Handbook No. 4000.4, § 2-5. The specially approved underwriter is commonly referred to as a "DE Underwriter" or "Direct Endorsement Underwriter." This Direct Endorsement Underwriter must be trained and supervised in compliance with HUD regulations and all relevant federal laws, as if a HUD-underwriter him or herself.

49.    In exchange for the financial and other benefits of issuing HUD-insured mortgage loans, lenders provide HUD with certifications that they have underwritten the loans in strict compliance with HUD requirements. HUD leaves no doubt that it relies on the truthfulness of these certifications. "The underwriter is responsible for the quality of decisions made by the mortgagee under the program. For endorsement purposes, the Department relies upon certifications by the mortgagee and the mortgagee's underwriter that the mortgage loan complies with HUD regulations and underwriting instructions." HUD Handbook No. 4000.4, § 3-16. If, however, the lender and its authorized Direct Endorsement Underwriter submit fraudulent certifications, the Direct Endorsement program is frustrated and HUD's mortgage insurance fund is subject to payment for mortgages that never should have been insured.

50.    Direct Endorsement is not a separate program; rather, it is the mechanism that enables FHA-approved lenders to consider single-family mortgage applications without first submitting paperwork to HUD.

51.    During the period relevant to this action, virtually all single-family FHA mortgage lending was (and continues to be) done through Direct Endorsement.

52.    FHA-approved lending institutions can use the Direct Endorsement process only if they meet HUD's criteria. These criteria are intended to ensure that lenders have enough experience to conduct their business in accordance with sound lending standards and required industry ethics. According to HUD's website, for example, the lender must have five years' experience originating single-family mortgages or have a principal officer who has originated

them for at least five years, and the lender must follow all HUD regulations and other laws that apply to mortgage lending.

53.   Any person who meets the income requirements for a FHA-insured single-family mortgage and can make the monthly mortgage payments is eligible to apply to a HUD-approved lender that uses Direct Endorsement. Investors also may participate.

54.   A lender that wants to participate in the DE program must complete an Application for Approval as Direct Endorsement Mortgagee. Once a lender is approved and participating in the program, it must fulfill certain responsibilities. Lenders are guided in meeting their duties by a set of HUD technical handbooks.

55.   Each approved DE lender must have on its staff "a full-time employee to serve as underwriter. The underwriter must be a corporate officer with signatory authority or otherwise authorized to bind the mortgagee in matters involving the origination of mortgage loans." HUD Handbook No. 4000.4, § 2-4. "HUD looks to the underwriter as the focal point of the Direct Endorsement program." Id., § 2-4(C).

56.   Once a borrower is approved by the lender and closing has occurred, the lender submits the loan to HUD for FHA insurance endorsement.

### 2.   Legal requirements for lenders participating in the Direct Endorsement mortgage insurance program

#### a.   Statutory requirements

57.   Congress and HUD have prescribed to lenders clear standards for approval of mortgage insurance, including standards for appraisals.

58.   In 1989 amendments to the National Housing Act, Congress adopted appraisal standards. 12 U.S.C. § 1708(f). The Act requires HUD to "prescribe standards for the appraisal of all property to be insured by the Federal Housing Administration. Such appraisals shall be performed in accordance with uniform standards, by individuals who have demonstrated

- 13 -

competence and whose professional conduct is subject to effective supervision." 12 U.S.C. § 1708(f)(1).

59.    Congress established minimum appraisal standards, which it authorized HUD to build upon further. These minimum standards are that: (1) appraisals "shall be performed in accordance with generally accepted appraisal standards," and (ii) each appraisal be a written statement that is "independently an[d] impartially prepared by a licensed or certified appraiser setting forth an opinion of defined value of an adequately described property as of a specific date, supported by presentation and analysis of relevant market information." 12 U.S.C. § 1708(f)(1)(A), (B).

60.    The law sets independence standards for appraisers involved in federally-regulated transactions. *See* 12 U.S.C. §§ 3331, *et seq.* It provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

61.    In 1990, Congress added standards to apply specifically to DE program appraisers. It required that appraisers comply with qualifications or standards established by HUD, and that the individual responsible for the appraisal personally approve and sign the appraisal report. 12 U.S.C. § 1708(f)(3)(B).

62.    Congress also imposed restrictions on appraisal companies by requiring only specifically approved appraisers to perform appraisals for HUD-insured mortgages. For individuals who are employees of appraisal companies, only those persons who meet the qualifications or standards for appraisers and inclusion on appraiser fee panels established by

HUD are eligible to conduct appraisals insured by HUD, *i.e.*, FHA-insured mortgages. 12 U.S.C. § 1708(f)(4).

63.     In July 2008, Congress imposed additional restrictions on approved appraisers. Beginning on July 30, 2008, "any appraiser chosen or approved to conduct appraisals for mortgages under this title shall:  (A) be certified (i) by the State in which the property to be appraised is located ... or (ii) by a nationally recognized professional appraisal organization; and (B) have demonstrated verifiable education in the appraisal requirements established by the [FHA]." 12 U.S.C. § 1708(f)(5).

#### b.     Regulatory requirements

##### (1)     Underwriting requirements

64.     Exercising its statutory authority, HUD adopted regulations governing lenders who seek to issue FHA-insured mortgages. *See generally* 24 C.F.R. §§ 203.1 *et seq.*

65.     As pertinent here, a lender must be approved under HUD's regulatory procedures to issue insured mortgage loans under the Direct Endorsement program.  24 C.F.R. § 203.3(a); *see also* 24 C.F.R. § 203.4.  The lender must use a *bona fide* underwriter who is on its permanent staff and is registered with HUD. 24 C.F.R. § 203.3(b)(2).

66.     HUD imposes due diligence requirements on lenders' approved underwriters. "A Direct Endorsement mortgagee shall exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R. § 203.5(c).

67.     Underwriters are required to be in "compliance with [the] guidelines" found in the HUD Underwriter Handbook, No. 4155.1, which creates the "minimum standards of due diligence" in underwriting mortgages.  24 C.F.R. § 203.5(c).

##### (2)     Appraisal requirements

68.     "[A]n appraisal is performed to determine the maximum insurable mortgage and to also protect the FHA insurance funds." 24 C.F.R. § 200.200(b).

010124-11 299884 V1

69.    HUD requires lenders to use only those appraisals that meet FHA requirements. 24 C.F.R. § 203.5(e)(1).

70.    A lender is required to "ensure that an appraisal and related documentation satisfy FHA appraisal requirements," and "both [the lender and the appraiser] bear responsibility for the quality of the appraisal in satisfying such requirements." 24 C.F.R. § 203.5(e)(3).

71.    A lender may use an appraiser only if he or she is listed on the FHA Appraisal Roster. 24 C.F.R. § 203.5(e)(1).  In turn, appraisers listed on the FHA Appraiser Roster are responsible for obtaining, reading, and complying with the HUD Appraiser Handbook 4150.2, any updates, and "all other instructions and standards issued by HUD when performing all appraisals of properties for HUD single family mortgage insurance purposes." 24 C.F.R. § 200.206.

72.    HUD requires lenders to ensure that sellers of property deliver to the purchaser a written appraisal in a form that complies with FHA requirements." 24 C.F.R. § 203.15.

### c.    Lender certifications to induce FHA to approve Direct Endorsement mortgage insurance applications

73.    HUD's regulations provide that any "certification required by [FHA] shall specifically state that it has been made, presented, and delivered for the purpose of influencing an official action of the FHA, and of the Commissioner [of FHA], and may be relied upon by the Commissioner as a true statement of the facts contained therein." 24 C.F.R. § 200.62.

74.    As pertinent to this case, HUD requires Direct Endorsement lenders to submit three properly completed forms and certifications with applications for mortgage insurance.  24 C.F.R. § 203.255(b).

75.    Lenders must submit a "[p]roperty appraisal upon a form meeting the requirements of [HUD] (including, if required any additional documentation supporting the appraised value of the property …). 24 C.F.R. § 203.255(b)(1).

010124-11 299884 V1

76.    Lenders also must submit an underwriter certification.  This must state that the underwriter "has personally reviewed the appraisal report … and that the proposed mortgage complies with HUD underwriting requirements, and incorporates each of the underwriter certification items that apply to the mortgage submitted for endorsement, as set forth in the applicable handbook or similar publication that is distributed to all Direct Endorsement mortgagees …." 24 C.F.R. § 203.255(b)(5).

77.    In addition, lenders must submit a separate mortgagee certification.  This must state that "the authorized representative or the mortgagee … who is making the certification has personally reviewed the mortgage documents and the application for insurance endorsement, and certif[ies] that the mortgage complies with [24 C.F.R. § 203.255(b)]." 24 C.F.R. § 203.255(b)(11).  In addition, "[t]he certification shall incorporate each of the mortgagee certification items which apply to the mortgage loan submitted for endorsement, as set forth in the applicable handbook or similar publication that is distributed to all Direct Endorsement mortgagees." *Id.*

### d.    Appraisal requirements in HUD Handbooks and Forms submitted to FHA as applicable to Direct Endorsement lenders

78.    "The success of the FHA insurance program and HUD's ability to protect its financial interest begins with selecting qualified and knowledgeable appraisers." HUD Handbook No. 4150-2 CHG-1, "Valuation Analysis for Single Family One- To Four-Unit Dwellings." This is because "[f]or HUD, the purpose [of an appraisal] is to determine market value for mortgage insurance purposes." *Id.*, § 4-1(C).  "Appraisals performed for HUD/FHA are not intended to protect the buyer: they protect HUD." *Id.*, § 5-1(C).

79.    The lender's approved Direct Endorsement Underwriter is responsible for determining that the property is acceptable for mortgage insurance.  HUD Handbook 4000.4 REV-1, Single Family Direct Endorsement Program (9/2/88), § 1-2.  This includes the responsibility to review the appraisal report prepared by the staff or fee appraiser to determine

- 17 -

eligibility, the maximum mortgage amount, and the acceptability of the conclusions reached by the appraiser. *Id.*

80. The Direct Endorsement Underwriter has the responsibility to: comply with all HUD instructions; review appraisal reports to ensure reasonable conclusions, sound reports, and compliance with HUD requirements; make final decisions relating to the acceptability of the appraisal and the overall acceptability of the mortgage loan for HUD insurance; remaining aware of the warning signs that may indicate irregularities, detecting fraud, and making underwriting decisions with due diligence in a prudent manner. HUD Handbook No. 4000.4 REV-1, § 2-4(C).

81. The Direct Endorsement Underwriter receives a CHUMS number, pursuant to HUD regulation. HUD Handbook No. 4000.4 REV-1, § 2-3(F)(2)(C). This CHUMS identification number is "automatically recognized in each Field Office where a lender has been approved to do business" and is required to be provided on FHA documents submitted to HUD. *Id.* This number may be used only by the person to whom it is assigned.

82. The lender provides the assigned appraiser a Uniform Residential Appraisal Report ("URAR") and a Form HUD-92800.5B (Conditional Commitment, Direct Endorsement, Statement of Appraised Value). HUD Handbook 4000.4 REV-1, § 3-2(D). After completing the URAR, the appraiser returns it to the lender's underwriter. HUD Handbook 4150.2 CHG-1, § 1-2(C). The underwriter reviews it and, if proper, submits it to FHA with the application for mortgage insurance, called the Request for Insurance Endorsement Under the Direct Endorsement Program (Form HUD-54111). *Id.*, § 3-22.

83. The URAR is required to contain a truthful opinion of the market value of the property subject to the mortgage loan. "Market value" is defined as "[t]he most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus." *Id.* at 2; *see also* HUD Handbook 4150.2 CHG-1, § 4-1(A).

84.     The URAR contains numerous certifications by the appraiser. The first one is: "Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, *my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $_____, as of _____, which is the date of inspection and the effective date of this appraisal*" (emphasis added). Uniform Residential Appraisal Report ("URAR"), Freddie Mac Form 70 and Fannie Mae Form 1004 (March 2005), at 2.

85.     The URAR contains a representation that the appraiser conducted a complete visual inspection of the interior and exterior areas of the subject property and analyzed comparable properties "in the subject neighborhood." URAR at 2; *see also* HUD Handbook 4150.2 CHG-1, § 3-1 and Appendix D. The comparables must be examined "from at least the street," and the appraiser must inspect the neighborhood as well. *Id.* at 4.

86.     The URAR contains a list of 25 express appraiser certifications. HUD has stated that "[o]f particular importance is the certification that the appraisal is not based on any of the following: a requested minimum value[;] a specific value[; or] the approval of a loan as indicated." HUD Handbook 4150.2 CHG-1, § 5-1(A)(2). Most pertinent to this case are:

> 2. I performed a complete visual inspection of the interior and exterior areas of the subject property.
>
> 3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.
>
> 7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.
>
> 10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.
>
> 11. I have knowledge and experience in appraising this type of property in this market area.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

URAR at 5.

87.     The Uniform Standards of Professional Appraisal Practice ("USPAP") require appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct). USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions." *Id.* In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client.

88.     USPAP is incorporated into federal law, 12 C.F.R. § 34.44, and into FHA requirements, *see supra* ¶ 85. The above obligations are generally incorporated into FHA-required certifications submitted by lenders.

89.     The lender's authorized Direct Endorsement Underwriter also reviews and submits to FHA the Form HUD-92800.5B (Conditional Commitment, Direct Endorsement,

Statement of Appraised Value).  HUD Handbook 4000.4 REV-1, § 3-22(A)(16).  This form

states the estimated value of the property, *i.e.*, the appraised amount.

90.     The Direct Endorsement Underwriter is required to execute the underwriter

certification on the Underwriter/Mortgagee Certification, Form HUD-54113.  The underwriter's

certification expressly represents that the mortgage, including the appraisal, meets FHA

requirements.  It states:

> I, the undersigned underwriter, certify that I have personally
> reviewed the appraisal report (if applicable) credit application, and
> all associated documents and have used due diligence in
> underwriting this mortgage.  I find that this mortgage is eligible for
> HUD mortgage insurance under the Direct Endorsement program
> and I hereby make all certifications required for the mortgage as
> set forth in HUD Handbook 4000.4.

91.     Appendix 3 of HUD Handbook 4000.4 is entitled "Underwriter's Certification."

Among other things, this certification states that "[t]he underwriter executing form HUD-54113

has personally reviewed the appraisal report (if applicable) … and certifies, for and on behalf of

the mortgagee, that the mortgage complies with HUD underwriting requirements as contained in

all outstanding HUD handbooks and Mortgagee Letters …."

92.     In addition, an authorized representative of the lender, who may be the Direct

Endorsement Underwriter, executes the mortgagee's certification on Form HUD-54113.  It

states:

> I, the undersigned, as authorized representative of [lender name],
> mortgagee at the time of the closing of the mortgage loan, certify
> that I have personally reviewed the mortgage loan documents,
> closing statements, application for insurance endorsement, and all
> accompanying documents.  I hereby make all certifications
> required for this mortgage as set forth in HUD Handbook 4000.4.

93.     Appendix 4 of HUD Handbook 4000.4 is entitled "Mortgagee's Certification."

Among other things, this certification states that "[t]he mortgagee executing form HUD-54113

has personally reviewed the mortgage documents and the application for insurance endorsement

- 21 -

010124-11 299884 V1

and certifies that the mortgage is eligible for mortgage insurance under HUD's Direct endorsement program."

94.     HUD staff conducts a pre-endorsement review of the case binder submitted by the lender under the Direct Endorsement program using the Pre-Endorsement Review Checklist. HUD Handbook 4000.4, Appendix 17.  If the pre-endorsement review provisions have been met, HUD will endorse the mortgage for insurance.  If the pre-endorsement review provisions are not met, HUD will return the file to the lender for correction.  HUD Handbook 4000.4 states that "[m]ortgagees are responsible for complying with all applicable HUD regulations and handbook instructions." HUD Handbook 4000.4, § 1-3.

95.     HUD staff's Pre-Endorsement Review Checklist states that it lists "the pre-endorsement review documents required by [12] C.F.R. § 203.255 and represent[s] Statutory and Regulatory Requirements." HUD Handbook 4000.4, Appendix 17.

96.     The Checklist requires the HUD staff member determine that the lender and its authorized underwriter signed all required certifications.  Under the DE program, HUD does not conduct an independent review of the accuracy of the certifications, but instead relies on the truthfulness of the lender and its authorized underwriter.

## V.     ALLEGATIONS

### A.     Defendants Develop and Implement a National Strategy to Falsely Inflate Home Appraisals Causing False Claims for Payment by the Government

#### 1.     Countrywide becomes a dominant force in the mortgage industry

97.     During the time period relevant here, Countrywide had hundreds of billions of dollars in loan production annually and a residential mortgage servicing portfolio in excess of $1 trillion.

98.     Countrywide has originated mortgages through various channels.  Their retail operation, largely branded Countrywide Home Loans, Inc., operates brick-and-mortar store fronts where Countrywide acts as the loan broker and the lender.  Countrywide has also

- 22 -

maintained and staffed a large on-line mortgage origination business, also, ostensibly, a Countrywide Home Loans operation.  Additionally, Full Spectrum Lending ("FSL") was a Countrywide brand devoted to the sub-prime lending arm of Countrywide.  FSL operated both through the internet and through direct advertising and solicitation.

99.     Countrywide Financial also entered into multiple joint venture agreements with builders and realtors, creating conflicts-of-interest which helped them to corrupt the underwriting and appraisal practice.  For example, Countrywide Financial entered into a joint venture agreement with KB Home (or "KB") by which all KB Home buyers were required to complete a credit application from Countrywide as a condition precedent to entering a contract to buy a KB-built house.  As a result, virtually all KB Home sales from the date of the inception of the joint venture agreement were funded with Countrywide loans.  Finally, Countrywide has created an extensive network numbering over 30,000 "independent" mortgage brokers who take applications from borrowers and place their loans with Countrywide through its wholesale lending division.

100.    By 2004, when Mr. Lagow joined LandSafe, Countrywide had become the largest home mortgage lender in the United States, built on years of primarily offering customary fixed-rate mortgage loans to borrowers.  By that time, Countrywide, led by its CEO and founder Angelo Mozilo, aggressively fought against competitors in part by originating more exotic mortgage loans in order to qualify more lenders.  In this drive to grow, Countrywide viewed the appraisal not as a safeguard against excessive lending on a property, but to the contrary as a roadblock to closing a loan.  As a result, corrupting the underwriting and appraisal process was a necessary step in dominating in the marketplace.  Over the period of time relevant here, Countrywide's mortgage portfolio – and lending standards – changed dramatically, to the ultimate detriment of consumers and the economy.

101.    Since 2003, Countrywide has continually loosened its underwriting guidelines to the point of nearly abandoning them by 2006.  Countrywide's highest-level managers authored

- 23 -

official documents, including underwriting matrices and guidelines, that memorialized Countrywide's systematically lowered lending standards. Mozilo's stated goal was to gain 30% of the national market for mortgage originations. To do so, he and other executives at Countrywide ordered many of the lowered underwriting and appraisal standards.

102.   Most relevant here, among the critical standards that were compromised and corrupted were those pertaining to home appraisals, including appraisals done in furtherance of FHA-backed loans. By demanding fraudulent value inflation of appraisals for FHA-backed loans, defendants knowingly violated federal law which heavily regulates the underwriting and appraisal industries, and FHA-mortgage lending in particular.

103.   The conduct alleged in this complaint was brought to bear by defendants on all FHA-insured mortgage loans issued by Countrywide and its affiliated mortgage lending institutions.

### 2.   Defendants systematically corrupt the underwriting and appraisal process, with an eventual focus on FHA-backed loans

104.   Countrywide had a firmly entrenched practice of manipulating the appraisal process to feed the ever-growing loan pipeline. To put it plainly, Countrywide made money by making loans. It worked aggressively and unlawfully to prevent a final appraisal from coming in with a valuation *less than was necessary to close the loan.* In order to accomplish this, defendants systematically violated core provisions of federal law and other federal regulations.

105.   During the housing boom, as Countrywide consistently lowered its lending standards to feed the pipeline to the secondary market, FHA maintained its standards, writing only 30 year fixed-rate mortgages and continuing to require fully documented applications. As a result, the vast majority of low-or-moderate-income borrowers were steered away from the relatively harder to close FHA loans into sub-prime loans.

106.   However, with the collapse of the sub-prime market during 2006, including a downturn in Countrywide's own FSL sub-prime division, there was a tremendous push by

lenders, including Countrywide, into FHA loans.  The loans were aimed at low-to-moderate-income borrowers who could no longer access the sub-prime mortgage market.  By the fourth quarter of 2008 nearly one-third this country's new loan originations were FHA-backed.

> **a.    Countrywide's use of LandSafe to implement the fraud**

107.    Countrywide addressed the problem of "independent appraisals" coming in at actual value, impeding Countrywide's ability to sell homes at inflated values, by its affiliation with LandSafe and their agreement to conspire in appraisal inflation.  Through LandSafe, Countrywide could (1) use its market power to pressure appraisers to inflate values to whatever Countrywide needed and punish appraisers who refused to "play ball;" and (2) use fraudulent appraisal "reviews" to support fraudulently inflated appraisals and increase the values on accurate appraisal reports to arrive at the level needed to "close the deal."

108.    LandSafe utilized two distinct appraisal mechanisms.  First, it would assign appraisal requests for Countrywide wholesale or retail loans, including FHA-backed loans, to either outside "fee" appraisers or its own "staff" appraisers.  As described below, these outside fee appraisers were pressured to inflate values through the use of targeted values and the threat of blacklisting; the staff appraisers were pressured directly by their employer, LandSafe, to inflate values falsely, as necessary to close a deal.  Second, it would "review" all appraisals for Countrywide loans ostensibly as a quality control measure.  In reality, the "review" mechanism was a sham created by defendants to (1) create the illusion of a robust underwriting process to verify property values; (2) to allow for rewriting and inflating of any appraisal valuations that, if left undisturbed, would prevent the associated loan from closing ; and (3) to allow defendants to market this sham "review" mechanism and thereby mislead investors and regulators into believing its assets were more secure and less in need of oversight than competitor products.

109.    The pressure to inflate values often came from the Countrywide lending office or the loan broker that originated the loan directly to the appraiser it hired to determine property value.  As LandSafe grew in staff and geographical coverage, instead of insulating appraisers

010124-11 299884 V1

from pressure by the lender and loan broker to close the deal, it did the opposite. It became the conduit of value inflation pressure from the lending office, through the appraiser supervisors or reviewers, and down upon the assigned appraisers. As a staff appraiser supervisor, fee appraiser supervisor, and review appraiser supervisor, Mr. Lagow was a first-hand witness to the fraudulent appraisal scheme developed and implemented by Countrywide and LandSafe.

### b. Mr. Lagow's introduction to Defendants' appraisal fraud

110. When Mr. Lagow started at LandSafe in 2004, he was immediately placed in a supervisory position over a team of staff appraisers whose primary purpose was to perform appraisals on loans originated by Countrywide. His responsibility was to hire and train new staff appraisers in multiple states and directly supervise these appraisers in their completion of appraisals on Countrywide loans. During his tenure at LandSafe, Mr. Lagow opened new markets for the company, hiring teams of appraisers to handle Countrywide's loans across Utah, Colorado, Arizona, Louisiana, Texas and Oklahoma.

111. In early 2005, Mr. Lagow attended a meeting with newly installed LandSafe President Todd Baur, Senior Vice President, Appraisal Governance David Mentesana and Mr. Lagow's supervisor First Vice President, Regional Appraisal Manager Eric Sanford. In this meeting, Baur discussed a new initiative to have staff appraisers start completing multimillion dollar assignments and assignments that were atypical to the appraisal market. Baur believed that Countrywide needed staff to handle the special properties. Mr. Lagow, however, noted that the existing staff appraisers were not yet trained or experienced enough to perform complex appraisals. Mr. Lagow noted in the meeting that LandSafe staff appraisers were undertrained, and their pay was based on production; to have them doing atypical properties was a dangerous venture destined to create unreliable reports. Baur said that the decision was already made and that the discussions in the meeting were to be treated as strictly confidential.

112. As a supervising appraiser and ultimately Assistant Vice President and Area Manager, Mr. Lagow was involved in many communications between the LandSafe staff

- 26 -

appraisers and Countrywide.  He was also directly involved in communications between Countrywide loan originators, through LandSafe, to fee appraisers.  In addition, Mr. Lagow was given a supervisory position over so-called review appraisers.  As set forth more fully below, these review appraisers were purportedly tasked with verifying the accuracy of staff and fee appraisers' reports, but in reality were neither trained nor equipped to do so.  Instead, review appraisers were pressured to pre-textually undermine *bona fide* appraisals that were not inflated and fraudulently interpose inflated ones that met the value the lender insisted upon.  Defendants orchestrated an appraisal review system designed not to check appraisals for accuracy, but rather to ensure appraisals supported whatever value was required to close the loan.

113.    With respect to KB Home in particular, loans on its homes were assigned for appraisal review by a special set of desk reviewers.  The loans reviewed by this desk included thousands of FHA-backed loans.  This special desk was in fact a gathering of untrained, unqualified so-called reviewers who improperly completed "appraisal reviews" of KB homes all across the United States, while situated at one desk site in Plano, Texas.  LandSafe was well aware that many of these reviewers were not even licensed appraisers, including David Steig, Laura Roberts, and Beth Marino who were only recently licensed as appraisers, but who nevertheless were assigned to "review" scores of appraisals on FHA-backed homes completed by Mr. Lagow's staff.  This sham review process benefitted both parties in the Countrywide-KB Home joint venture - Countrywide closed all its loans and KB Home sold its homes at inflated prices - helping to protect and further inflate appraisals.

114.    Early in his tenure at LandSafe, Mr. Lagow observed and attempted to forestall Countrywide and LandSafe's manipulation of the appraisal process, a manipulation intended to help fill the mortgage origination pipeline.

115.    In early 2005, Mr. Lagow attended a meeting with LandSafe President Todd Baur and a group of other appraisal managers.  Baur told the appraisal managers, including Mr. Lagow, (1) that they needed to quit thinking of an appraisal as a separate unit; (2) that LandSafe

appraisers were there to help facilitate a closing; and (3) that they needed to change their thought process, the clear implication being that they needed to stop thinking like appraisers and think instead like lenders trying to close a loan. Mr. Lagow and his colleagues came to understand from Baur that the appraisal manager job at LandSafe was to make sure that appraisals did not derail Countrywide loans - period. To question the propriety of a given valuation, as Mr. Lagow continued to do during his tenure at LandSafe, only served to obstruct the pipeline, decrease company profits, and jeopardize one's own career.

### c.   Fraudulent appraisals on home mortgages

#### (1)   Violating underwriter obligations by conspiring with builders and lenders, and the "cherry-picking" of fraudulent appraisers

116.   Many KB Home properties were sold using FHA-insured mortgage loans. The practices described below apply to both FHA-backed and other Countrywide mortgage loans.

117.   In May 2005, Mr. Lagow learned of the planned joint venture between KB Home and Countrywide. In July 2005, Mr. Lagow was asked to hire staff appraisers to work on Countrywide loans for KB Home from a list of appraisers supplied by First American Title Company (who had for years been handling all the escrows for KB Home sales). When Mr. Lagow contacted those appraisers and offered them opportunities as LandSafe staff appraisers, most declined, having already been told by KB Home that they would continue to get the appraisal work from KB Home as pre-selected fee appraisers.

118.   Mr. Lagow succeeded in hiring appraisers in the Arizona and Houston, Texas markets and began trying to get them appraisal assignments for Countrywide loans on KB Home sales. Mr. Lagow observed that none of the KB Home appraisal orders were going through the LandSafe system at all. Eventually a couple of orders in the Houston market were assigned to Mr. Lagow's staff appraisers. When the appraisers went to the actual homes to do their inspections, however, they were turned away and told by the KB Home sales representative that KB Home had an agreement that it alone would decide who did its appraisal assignments.

- 28 -

119.   Mr. Lagow went to First Vice President Robert Patrick to complain about this practice. Patrick was in charge of the fulfillment of appraisal orders through Countrywide's retail channel, including the appraisals on KB Home sales. Patrick told Mr. Lagow that a single LandSafe appraisal manager, Kay Cobb, handled everything about KB Home sales. Mr. Lagow went to Cobb and was told by her that she assigned all the KB orders manually, that KB Home required an appraiser to be from an approved list of appraisers, and that Mr. Lagow's staff should not be doing KB Home work. Such work was to be reassigned (and was) to appraisers chosen by KB Home, despite the fact that this practice violates multiple FHA certifications and requirements.

120.   Mr. Lagow observed that appraisal orders were all going to a limited number of appraisers in each market. In Houston the appraiser chosen by KB Home was Christos Catechis. Patrick later confirmed this monopoly with Mr. Lagow in an October 17, 2005 email. Mr. Lagow discussed this issue further with Patrick, who acknowledged his own research showed that Catechis was doing over 400 appraisal orders in one month *by himself*, and at an inflated price of nearly $450 per report. This practice too violates FHA certifications and requirements.

121.   As part of its efforts to prevent appraisers from finalizing appraisals at actual market value, appraisers within LandSafe were routinely denied access to HUD documents necessary to verify as *bona fide* any comparables that were themselves KB Home sales. These documents, particularly HUD-1 Settlement Statements, by law must reflect the final, actual sale price of a home as opposed to the Multiple Listing Service (or "MLS") price which was more readily available but unreliable. KB Home would often reduce the sale price of a home at the final moment of sale, but, in order to maintain the appearance of a strong market in its developments, report the non-reduced price for publication in the MLS. The HUD-1 Settlement Statement, with information provided by the title company rather than KB Home, reflected these late concessions on price. By refusing to provide HUD-1 Settlement Statements, KB Home pressured appraisers to use inaccurate MLS listings instead, so as to perpetuate the appraisal

- 29 -

inflation not only for the property in question, but homes close in proximity and used as comparables.

122. Mr. Lagow specifically insisted to his supervisor, Sanford, and others that his appraisers needed access to the HUD-1 Settlement Statements before properly appraising a home. Mr. Lagow sent multiple e-mails complaining that his appraisers were being denied access to these documents, and even being targeted for blacklisting by KB Home, as discussed in detail below.

123. Sanford warned Mr. Lagow about putting these claims in writing. Quite simply, KB Home, and its partner Countrywide, did not want accurate comparables going to appraisers where they would lead to appraisals coming in under the inflated contract value that was expected, and insisted upon. Mr. Lagow knew that accurate appraisals required use of HUD-1 Settlement Statements because he was aware that KB Home inflation practices were routinely implemented for the purpose of inflating comparables, to compound the fraud to entire neighborhoods, then regions, and eventually much of the United States.

124. Concerned about KB Home practices and Catechis in particular, Mr. Lagow had already, on September 7, 2005, written an email to Sanford, asking him to send the message on to Senior VP Mentesana, stating the following:

> In summary: We have a clear attempt to control the market, utilization of one appraiser, a refusal to supply data with outside appraisers, and the appraiser of choice is being paid a fee abnormally higher than what we pay everyone else for the same work. Add in the fact that recent appraisals from outside appraisers have come in low and I could make a fairly strong case for market manipulation and appraisal fraud. Even if it is not intentional, it looks bad.
>
> If there is a desire to fix this situation in a productive manner I have some suggestions. However, it will have to be corrected eventually. We just get to decide when we correct the problem and how much damage we allow. I also want to caution anyone who cares to listen, if we allow this in Houston it will spread through the KB Homes markets.

010124-11 299894 V1

125.   Exacerbating the pressure for appraisal fraud, LandSafe also instituted a

production-based pay scale.  Appraisers had to significantly increase their report production

(decreasing the time spent on each report) in order to make the same or similar income.  In less

than a year, LandSafe had taken a handful of trainee appraisers, forced high-production volume

including large numbers of high dollar and atypical properties, and allowed Countrywide's own

loan officers to request target audits on LandSafe appraisers if values were not met.

126.   In February 2006, after seeing no changes following his repeat attempts to rectify

the plainly apparent price inflation scheme that defendants were continuing, Mr. Lagow sent the

following email to his supervisor, Sanford, and Glenda Michaels at Countrywide Governance.

> Eric.
>
> At the risk of losing my job I am forwarding this email to you and
> want to relay my deepest concern for the situation addressed.  I
> report directly to you but I am also forwarding this to Glenda
> because she and I have talked about general concerns in the past.
>
> I have spent considerable time looking over the KB Homes
> situation in Houston, Texas and took some time to drive a couple
> of subdivisions this weekend and look around.  As you are aware,
> one appraiser controls the orders and the values....
>
> I believe that Christos Catechis and KB Homes are engaged in a
> fraud to manipulate the local market....In looking at Catechis
> reports, when he needs to for value, he goes outside the market to
> access superior sales to bump up the market and then uses the same
> sales in future sales, thus establishing and manipulating the market.
> The appraisal reports I have examined have a continual
> characteristic of selective manipulation of the market data in an
> effort to pump up the market.  *It is my opinion that, based on very*
> *limited data, we could be making 115% loans in the markets and if*
> *you examine some KB Homes subdivisions you see significant*
> *foreclosure rates.*  I believe that by our allowing the situation to
> continue we are condoning the activity and placing at risk the jobs
> of employees at Landsafe and Countrywide.  I am even more
> concerned, and I do not have any supporting data other than the
> logic that an order had to come from us, that *the individuals who*
> *mandated that only one appraiser be utilized may be a*
> *Countrywide employee and could be implicated in a conspiracy to*
> *defraud both the homeowners and stockholders.*
>
> *We are charged with the responsibility of protecting our client's*
> *assets.  If I am correct on any of this, and if it blows up, the blame*

- 31 -

> *will rightly fall on us for failing in our task.* This has the potential
> to be a lightening rod for the demise of Landsafe and we will need
> to act to make sure every effort has been made to safeguard against
> this....
>
> Eric, I have just become aware of the situation and I still do not
> have the ability or resources to properly investigate and determine
> if I am correct....However, no matter if you think I am over
> reacting, it is urgent that we at least look into the matter and then
> immediately make changes to keep one appraiser from controlling
> the market....

(Emphasis added)

127.    By early 2006, Mr. Lagow had identified that defendants were exerting control over the home valuation process and that this resulted in inflated mortgages with actual loan-to-value ratios as high as 115% - far above the 97% generously permitted by the FHA insurance program – which in turn was leading to increased foreclosures.  A true loan-to-value ratio of 115% meant not only that the loan, absent the fraud, would not have qualified for FHA insurance to begin with, but also that FHA was insuring a loan in an amount 15% higher than the market value of the property securing the loan *at the time the loan was closed.*  These unsupported and unsecured high mortgages, facilitated by defendants' fraud, precipitated the home loan crisis that exploded in 2008.

128.    Shortly after his February 2006 email discussed above, Mr. Lagow's territories were reduced and he was specifically cautioned not to put such concerns in writing.

129.    Until his termination in late 2008, Mr. Lagow tried in vain to find anyone at LandSafe or Countrywide who seemed remotely concerned about the rampant appraisal inflation fraud that Mr. Lagow was witnessing and caught in the middle of.  Finally, in March of 2007, Mentesana communicated the results of his formal audit of the Houston market appraisal practice to the inner circle at LandSafe, including President Baur.  Confirming Mr. Lagow's complaints, the audit formally concluded that the subject appraisals were indeed pre-textual, and always came in at the value needed to close the deal.  Regrettably, the appraiser at fault, Catechis, was

not removed from the approved list, nor was his company. Instead, the same fraudulent appraisal inflation continued unabated.

130.    On April 30, 2007, Mr. Lagow sent another email to Sanford and Patrick explaining that the practices Mr. Lagow observed had risen to the point of being criminal in nature:

> ....
> Gentlemen, while the "conspiracy" tag is generously applied to those who do not agree with the given answers, but in this case it is conspiracy. It is called conspiracy to commit fraud and the feds prosecute it willingly. Knowing about a situation and not acting to remedy the situation is why the feds tag "co-conspirator" on some people. There are thousands of people in Houston who have been damaged by Catechis, our process, and our willingness not to engage the situation.

### (2)    Inflating appraisals through undisclosed price concessions

131.    Another component of appraisal fraud involves seller concessions made at the time of closing which result in an actual lowering of the sale price. When such concessions are not reported, an inflated valuation is documented and relied upon by future appraisers, including as comparables referenced in a subsequent appraisal. This practice violates FHA certifications and requirements. Defendants promoted this manipulation by design, and Mr. Lagow was well aware of the ubiquity of this practice. Appraiser Timothy Jirles noted this in a December 18, 2006 email where he identified the well-known practice of KB Home in Las Vegas to offer concessions at closing without correspondingly documenting the devaluation of the home price.

132.    This improper conduct meant that reliance upon publicly available closing data was compromised in determining actual values in honest appraisals. Despite this, Sanford himself acknowledged defendants' widespread use of these documents as a basis for appraisals, and specified such reliance, for example, in a July 2007 email. Mentesana also acknowledged to Baur in an email dated March 7, 2007, that this practice was common in the Houston market. Done systematically in a given neighborhood, this practice served to artificially inflate the values of multiple homes including FHA-backed homes, increasing further the chances of default.

d. **Intimidation and blacklisting of appraisers who refuse to provide false appraisals to meet predetermined values**

133.    During Mr. Lagow's tenure, he witnessed rampant intimidation and blacklisting of numerous appraisers, including persons he either hired or contracted to work with LandSafe. Defendants implemented their intimidation tactics through an appraisal "audit" or internal review process. These "audits" were triggered by nothing other than an appraisal coming at less than the value desired by Countrywide.

134.    On September 27, 2005, Mr. Lagow wrote the following to Evelyn Grevelle, First Vice President, Appraisal Quality at LandSafe, noting inflated appraisal values being pushed by Countrywide's Full Spectrum Lending and its attempts to remove appraisers who derailed their originations by reporting accurate valuations:

> I realize you are busy and apologize for adding to the workload.
> Can you tell me how the target audit went on our Houston
> appraiser we talked about? I would also like to know how the
> audit of the staff appraiser, Kristin Patton, is going or went if you
> get a chance. FSL is mad at her because she brought some deals in
> low and they are trying to find an acceptable means to remove her.
> I think the bigger problem is unrealistic value expectations, but
> nobody asked me. So if you have any information I would
> appreciate the insight.

135.    The cannibalization of LandSafe staff appraisers by Countrywide's own loan officers was not limited to Patton. Appraisers Kenny Butler, Tracy Streich, Michelle Wilson, Veronica Crandall, Philip French, and Sherre George were all audited by LandSafe's governance department. They were all staff appraisers who were audited at the request of loan officers when values did not meet the expectations of the loan officers. With respect to any FHA-backed mortgages, not only was this conduct improper, it also violated federal law and directly led to FHA insuring fraudulent appraisals, for which claims for payment would later be made.

136.    Just six weeks after the Houston-area audit described above, on April 24, 2007, Mr. Lagow received an email chain between Countrywide loan officers, FSL loan officers, Countrywide Vice Presidents, and a KB Home senior manager complaining that an appraiser w

- 34 -

not willing to fraudulently increase the value on an appraisal report enough to close the deal. The loan officers openly discussed the need for a higher value and "asked" what could be done "to fix this situation."

137.  The appraiser, James Smith, had been contracted by Mr. Lagow to inject some modicum of integrity and honesty into the process of valuing homes in the Houston market. Smith refused to go along with defendants' fraudulent appraisal scheme. He wrote a letter to Mr. Lagow complaining about the intense pressure he was getting to fraudulently report inflated values. Smith reported that Jim Luong, a senior sales manager at KB Home, had "stated they will not be able to continue to use my services if appraised values are below the contract price." Luong also told Smith "the appraiser they were using never provided appraisals below the contract price and used sales from outside the subdivision if necessary."

138.  The defendants' solution was to "review" the appraisal report and find a way to increase it further to close the deal. A senior loan officer, JV Branch Manager Walter Biscamp, sent an email April 30, 2007 to Mr. Lagow explaining that Countrywide had committed to "reviewing" any "missed valuations," and asked Mr. Lagow to do so. Mr. Lagow, frustrated with the knowledge that the entire "review" process was fraudulent, responded as follows:

> We have not received access to Buzzsaw [KB Home's internal sales system], have not received the six month sales data, have not received the names and numbers to the closer for each subdivision to verify sales, and we have not received a region breakdown map. We are operating blind at this point and since we don't have the data, it does little godd [sic] for me to review the file. I will, but I don't have anything to support a change.

139.  Smith also had reported KB Home fraud in 2007, including abuse of concessions and reporting, as well the engineered refusal of access for appraisers to obtain needed HUD-1 Settlement Statements to properly execute appraisals. Ultimately, Smith, who refused to fraudulently inflate his valuation reports, was blacklisted not only from work on KB Home appraisals, but from all Countrywide loans.

010124-11 299884 V1

140. One further example, among several known to Mr. Lagow, involved LandSafe staff appraiser Michele Wilson who was challenged for her honest appraisals by Jason Pike and his wife, both Countrywide executives. At their request, Ms. Wilson became the target of an audit and her work was subsequently limited. This, because the Pikes' Countrywide lending business was adversely affected by Ms. Wilson's refusal to inflate appraisals to reach contract value on loans Countrywide issued.

141. After Mr. Lagow refused to further advance the fraud, offending appraisals and reviews frequently "disappeared" from their respective loan files and new appraisals, sufficiently high in value to close the deal, replaced them.

142. Remarkably, after Mr. Lagow's repeated objections still nothing changed. Throughout Mr. Lagow's time at LandSafe in 2007 and into 2008, defendants continued to openly demand and cause the inflation of appraisal values to close deals. In April 2008, Mr. Lagow was forwarded an email from Countrywide Branch Manager Christina Baisden to Carlyn Moore and Joy Dreher, also at Countrywide which articulated blacklisting of an appraiser as plainly as one can imagine:

> Carlyn,
>
> The Builder absolutely does not want the current appraiser, Warren Payne to do anymore of their appraisals. KB has had too many issues with this appraiser with values when other LandSafe appraisers have not had any issues. What can be done about this?
>
> Joy,
>
> In the mean time, has this appraisal been submitted for a second review concerning the lack of value? If not, can you please submit asap, the Builder does not want to lower the sales price until upper management reviews this as they believe the value is there.

143. As a clear statement of their scheme, Baisden recounts issues "with values" when other appraisers "have not had any issues." Further, her message to Dreher instructs that the builder does not want to lower the price because "they believe the value is there." KB Home

thus assumes and trumps the role of the actual appraiser who it seeks to punish for not submitting an appraisal report pre-textually set at the contracted sales price.

144.    Below this email was included the threatening message from Thomas Kempf at KB Home stating "[a]s far as I'm concerned KB Home will not accept appraisals from Warren Payne's office as nearly every appraisal comes in below value." Kempf was not complaining about the methodology or quality of the appraisals, rather only that they come in "below value." Unmistakably, Baisden, at the service of Kempf, was invoking both LandSafe's ability to punish uncooperative, honest appraisers through blacklisting; and LandSafe's corrupt "review" process designed to "fix" the problem of an appraisal report coming in too low to close a deal.

145.    Mr. Lagow learned that, in furtherance of the defendants' appraisal fraud, known and supported by KB Home, LandSafe had adopted a policy to protect KB Home's preferred inflated values by intimidating appraisers. LandSafe adopted a "Required Procedure – KB Home Below Contract Value Estimate Procedure" which was a "Review Appraiser Required Procedure." This document was provided confidentially to appraisers. This policy operated to intimidate honest appraisers, and blacklist those among them who would not inflate values.

146.    Under this policy, which addresses "below contract value estimates" (*i.e.*, appraisals that did not reach the value wanted by the builder and lender), once an appraisal review was "finalized on any KB Home Review when the final value estimate is below the contract price we [LandSafe] have committed to informing LandSafe & KB Homes Management." Even more intimidating, the policy requires that the appraiser send his "under value" appraisal to "your manager" and "manager's manager" as well as Patrick Ames, Senior Vice President, LandSafe Appraisal with the subject line "KB Home Below Contract" with the order and loan number included. This practice undermined the integrity of the appraisal process and intimidated appraisers into inflating their values.

- 37 -

the rate of loan approvals, Countrywide began to designate (almost indiscriminately) Direct Endorsement Underwriters among its staff, who were then empowered to review Countrywide loans for FHA compliance and certify such compliance to HUD.

148.    Consistent with the requirements of the DE Program, Countrywide assured HUD that it would properly hire, train, and insulate Direct Endorsement Underwriters so that they could perform their intended functions with required expertise and required *independence* to ensure that its FHA insured loans met FHA standards and requirements.   Mr. Lagow saw first hand that Countrywide did neither, and in fact did just the opposite.

149.    Instead, as Mr. Lagow watched first-hand, Countrywide simply designated over 700 Direct Endorsement Underwriters from among its existing workforce.  These people were untrained and had no idea how to underwrite a loan for risk or check an appraisal for conformance with USPAP and/or FHA and other controlling guidelines.  At each Countrywide branch office from which Countrywide loans were originated, *i.e.*, sold to consumers, the branch manager would merely designate one person as the Direct Endorsement Underwriter with limited or no formal training or instruction.

150.    Soon after this shift to Direct Endorsement Underwriters, Mr. Lagow was assigned responsibility for a large team of review appraisers whose sole assignments were to review the appraisals of Countrywide staff appraisers and independent fee appraisers, purportedly as a quality control measure, but in reality as an instrument of appraiser intimidation and value inflation.  This practice violates FHA certifications and requirements.  With respect to FHA loans, this practice ultimately caused the submission of false claims.

---

- 38 -

151.   As Countrywide well knew, the Direct Endorsement Underwriters were the sole backstop in the FHA underwriting process and compliance with federal lending regulations required that the Direct Endorsement Underwriters strictly adhere to FHA guidelines and requirements.

152.   Under FHA regulations, appraisals for FHA loans cannot be subject to review appraisers because only a designated Direct Endorsement Underwriter is permitted to evaluate the information associated with a FHA loan.   This is necessary to ensure the integrity of the loan process.  Nonetheless, Mr. Lagow observed a steady stream of assignments of FHA loan appraisals to his review appraisers.  Almost immediately after the shift to in-branch Direct Endorsement Underwriters, Mr. Lagow saw a tremendous jump in "contact" between the Countrywide lending offices, often by non-Direct Endorsement Underwriters, and the staff and fee appraisers under his supervision.

153.   This was not innocuous contact to check accuracy and to verify the integrity of the subject appraisals.  To the contrary, the new Direct Endorsement Underwriters, and others at Countrywide, contacted appraisers and pressured them to increase valuations.  These "corrections" were not because of flaws in the appraisals, but instead because a higher valuation was needed to close the loan and feed the pipeline.  Countrywide's Direct Endorsement Underwriters stepped squarely into the former role of the loan officer; they were told their job was to make the deal close.   To that end, among other things, defendants allowed out-of-state review appraisers to perform reviews in states where they were not licensed, in order to expedite closings.  These practices violate FHA certifications and requirements.

154.   Additionally, the number of files assigned to each Direct Endorsement Underwriter was so unrealistically high that not only could one person not possibly perform any real underwriting (even if he or she knew how), but also could not alone apply the pressure Countrywide needed to inflate values to all the loans under review.  Countrywide's solution, in direct contravention of FHA law, was to permit the Direct Endorsement Underwriters to provide

their unique CHUMS identification numbers to other staff at the branch office. These CHUMS are unique identifiers required by law to be used only by the Direct Endorsement Underwriter assigned the particular number. Contrary to FHA requirements, Countrywide loan officers, or their superiors, using the credentials of the Direct Endorsement Underwriter, would themselves reach out to the assigned appraisers (or their superiors) and exert whatever pressure was needed to fraudulently inflate the value of the home (and the FHA loan) to close the deal.

155.    Mr. Lagow repeatedly observed that his appraisers were being challenged by persons not the Direct Endorsement Underwriter on FHA-backed loans. Frustrated by this, Mr. Lagow directed all appraisers under his supervision to immediately call the named Direct Endorsement Underwriter for every appraisal they had challenged to verify that the actual Direct Endorsement Underwriter was bringing the challenge, as the law requires. Mr. Lagow raised this particular issue with Sanford, Ames and other executives, but to no avail. The ubiquity of this practice was difficult to imagine, and impossible for Mr. Lagow to tolerate. He even went so far as to develop a PowerPoint presentation which he provided to his superiors and his customers, stating the relevant legal requirements for FHA loans, and stating specifically that reconsideration of values on FHA loans could only occur, in his district at least (District 1), pursuant to a written request from a *bona fide* Direct Endorsement Underwriter.

156.    To provide one example, on December 19, 2007, appraiser Eric Fenlon appraised an FHA-backed home on behalf of Countrywide/LandSafe at a value of $75,000. Given that the loan was to be FHA-insured, relevant HUD law prohibits anyone other than the Direct Endorsement Underwriter from challenging the appraisal value. Notwithstanding relevant law, on January 9, 2008, Brad Notter, V.P. and Area Sales Manager for Countrywide, *not himself the Direct Endorsement Underwriter*, sent an e-mail to a number of Countrywide executives claiming that the "FHA [property] is undervalued" and "requires a reconsideration." Mr. Notter goes on to ask "[p]lease expedite this with Landsafe." This unlawful challenge from Countrywide's lending arm against the appraisers became standard practice.

- 40 -

157.    LandSafe appraisal reviewer Scott Hamilton, following the law, refused to consider Mr. Notter's "request for reconsideration" of the FHA-backed property on the grounds that the request came "from anyone other than the Direct Endorsement Underwriter." Hamilton noted that "[A]ll FHA reconsiderations must be submitted by the Direct Endorsement Underwriter with DE # clearly identified." Mr. Lagow learned during his tenure at LandSafe that Hamilton's compliance with FHA law and refusal to engage in appraisal fraud was the exception rather than the rule. Nonetheless, the LandSafe log notes for this property make clear that the Office of the President was notified of this refusal to reconsider the appraisal, and the appraisal review was reassigned on January 24, 2008. It subsequently was closed at a higher value, following Mr. Notter's unlawful challenge to the appraisal in an effort to simply "close the deal."

**B.      Relator Communicates the Continuing Fraud to the Highest Levels of Countrywide and LandSafe and Is Terminated**

158.    In January 2008, Mr. Lagow sent two emails to CEO Mozilo. In the first, Mr. Lagow sought to strike up a dialogue with Mozilo in the hopes that he would be able to finally get LandSafe on track. In the second, Mr. Lagow told Mozilo that in advance of his testimony before Congress, Mozilo needed to be aware of the appraisal fraud that he observed at LandSafe and Countrywide. Mr. Lagow told Mozilo that he did not believe Mozilo was getting complete and accurate facts from Baur and others who reported to him.

159.    Mozilo responded to Mr. Lagow by email, telling him that someone from his office would be in contact with Mr. Lagow. Within one or two days of the response from Mozilo, Susan Bow, Countrywide's Senior Managing Director, General Counsel and Secretary, called Mr. Lagow and talked to him for about an hour about the fraudulent practices that Mr. Lagow had observed leading to inflated appraisals at LandSafe for Countrywide loans. Mr. Lagow provided both an overview of the scheme and specific allegations of the fraud described herein to Ms. Bow.

160.    Shortly thereafter Mr. Lagow received a scheduled call from Countrywide Executive Managing Director and Chief Operations Officer Jack Schakett and Managing Director and Chief Compliance Officer Richard Wentz.  In this call, which lasted between 60 and 90 minutes, Mr. Lagow fully explained his concerns with the LandSafe appraisal process and his belief that appraisal values were being fraudulently inflated by LandSafe through pressure on staff and fee appraisers, fraudulent reviews of appraisals by unqualified, out-of-area appraisers, and violation of various federal laws.  Mr. Lagow specifically discussed his concerns about FHA fraud caused by inflated appraisals and the lack of training of Direct Endorsement Underwriters, as well as the abuse involved with pressuring of appraisers to hit the numbers to allow the loans to go through.  Mr. Lagow also specifically discussed his concerns about the KB Home appraisal process, and the governance audit by Mentesana that had verified Mr. Lagow's reports of fraud.

161.    Two weeks later, Mr. Lagow received an email from Wentz stating that he had looked into Mr. Lagow's complaints but found no issues that needed to be addressed.

162.    In the following weeks, it became increasingly clear to Mr. Lagow that he had fast become *persona non grata* at the office.  He had previously lost territory, and income, as a result of his reporting unlawful conduct within the defendant companies.  By late 2008, his supervisor would not communicate with him and he became increasingly concerned that his reporting of fraud would lead to further retaliation.  Mr. Lagow learned shortly thereafter that he was in need of treatment to combat cancer.  After assurances from Ames that he was a valued member of the team who need not consider leaving the company, he was fired by Sanford and simply told by the company that it had "decided to go in a different direction."

163.    Mr. Lagow has come to learn that defendants' fraudulent behavior continues unabated.  In a widely circulated e-mail within LandSafe sent April 20, 2009, Tracy Sanderson, the National Review Manager, First Vice President of LandSafe, provided LandSafe appraisers with an updated "Reviewer Job Aid" articulating protocol for the review of, *inter alia*, FHA-backed loans.  With respect to FHA reviews, the "Job Aid" improperly instructs its appraisers to

"[A]ttempt to solve appraisal issues within the review and provide an alternate value when the value is not supported within variance." Again, only the Direct Endorsement Underwriter is legally allowed to revisit the appraisal on an FHA-backed property, yet defendants continue to violate this requirement in order to continue fraudulent inflation of FHA-backed loan appraisals.

C.     **Defendants' Fraudulent Scheme Has Caused and Continues to Cause False Statements and the Submission of False and/or Fraudulent Claims for Payment to the United States**

164.   The defendants' abuse and corruption of the FHA-mortgage program through manipulation of home appraisals, in contravention of federal law regulating the appraisal industry and FHA-backed loans in particular, has caused, and continues to cause, false claims for payment by the government. By the submission of false mortgagee, underwriter, and appraiser certifications and falsely inflated appraisals to get FHA-backed loans, the defendants have caused and continue to cause caused insurance payments to be made on loans that did not actually qualify for FHA insurance in the first place, and fraudulently inflated levels. The Government has also paid and continues to pay other associated costs, through the FHA program, to the tune of hundreds of millions of dollars.

165.   These losses to the Government do not reflect a payment or debt obligation on the actual market value of these FHA-insured homes, either at the time of origination or any subsequent period, but rather, reflect a fraudulently obtained value created by the lender, often working with the builder, as part of a massive effort to profit from the artificial inflation of home values nationwide. Until the recent housing and financial crises, this unlawful conduct was hidden – as one commentator has noted, the rising market kept many sins from the light of day, as everyone was getting paid. But in the wake of the collapse, it is evident the defendants' conspiracy has not only brought significant pain and suffering to millions of homeowners, investors, borrowers, and all other Americans through the effect of the crash in the housing market, it has also caused the Government to pay money for false or fraudulent claims.

010124-11 299884 V1

166.   In particular, the fraudulent scheme alleged above caused defendants' Requests for Insurance Endorsement under the Direct Endorsement Program to be false or fraudulent because they contained false statements and mortgagee, underwriter, and appraiser certifications. These included, among others:

- That the appraised amount was a true and accurate statement of the market value, when defendants knew that the appraised amount exceeded market value;

- That the appraiser had completed a visual inspection of the interior and exterior of the property;

- That comparables were examined from at least the street;

- That the appraisal was performed in accordance with the requirements of USPAP;

- That the appraisal was based on comparable sales that were locationally, physically, and functionally the most similar to the subject property;

- That the comparable information provided by defendants was verified from a disinterested source;

- That the appraiser had knowledge and experience in appraising the type of property in the market area;

- That the appraiser had not withheld any significant information and that all statements and information, including the appraised amount, is true and accurate;

- That the appraisal report is the appraiser's own personal and unbiased analyses, opinions, and conclusions;

- That the appraiser's employment and compensation for performing this and future appraisals was not conditioned on any agreement or understanding that the appraiser would report (or present analysis supporting) a predetermined specific

010124-11 299884 V1

value, a predetermined minimum value, a range or direction in value, a value that favors the cause of defendants, or the attainment of a specific result or occurrence of a specific subsequent event, such as approval of a pending mortgage loan application;

- That the underwriter used due diligence in underwriting the mortgage; and

- That the mortgage is eligible for mortgage insurance under the Direct Endorsement program.

167.   The representations and certifications listed above are contained in the Uniform Residential Appraiser Report, the Form HUD-2800.5B, and the underwriter's and mortgagee's certifications in Form HUD-54113.  All such documents are submitted by the lender to FHA with the Request for Insurance Endorsement under the Direct Endorsement Program.

168.   These false and fraudulent statements in the mortgage insurance application induced FHA to approve the application.  Truthful representations and certifications in Form HUD-2800.5B and Form HUD-54113 are a precondition to FHA insurance.  If these statements and certifications had not been false, FHA would not have insured the mortgages.

169.   Further, accurate appraisals are a statutory condition of FHA mortgage insurance. Congress expressly prohibited FHA from insuring a mortgage that is in excess of "100 percent of the appraised value of the property." 12 U.S.C. § 1709(b)(2)(B).  In addition, "all property to be insured by the Federal Housing Administration" must have an associated appraisal that meets FHA standards.  12 U.S.C. § 1708(f)(1).  Defendants' scheme to inflate appraisals caused FHA to insure mortgages in excess of 100 percent of the *bona fide* appraised value of the property, in violation of FHA's express statutory authorization.  In addition, defendants' scheme resulted in the FHA illegally insuring property that lacked appraisals that met FHA standards.

170.   When these mortgages default, the owners of the mortgages (who include, but were not limited to the Countrywide Financial and its subsidiaries) submit claims for payment

- 45 -

for the FHA insurance that the defendant lending institutions have procured. These claims for payment were and continue to be false or fraudulent, because each is inflated by defendants' fraudulent scheme. Such claims for payment in effect completed defendants' violation of the False Claims Act.

## COUNT I

### FEDERAL FALSE CLAIMS ACT

### 31 U.S.C. § 3729(a)(1) and (a)(2)

171. Relator re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 170 of this Complaint.

172. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

173. Through the acts described above, defendants knowingly presented or caused to be presented false or fraudulent claims, records, and statements for payment or approval to the United States.

174. Through the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to pay or approve such false or fraudulent claims.

175. Each time defendants' fraudulent scheme resulted in FHA approval of an application for mortgage insurance containing false mortgagee and underwriter certifications and an inflated appraisal amount, where FHA ultimately received a demand for payment, defendants caused the presentation of a false or fraudulent claim. In addition, each application for mortgage insurance containing false mortgagee and underwriter certifications and an appraisal amount fraudulently inflated by defendants' scheme represents a false or fraudulent record or statement to induce the United States to pay or approve a false or fraudulent claim.

176.    The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by defendants, paid and continues to pay claims that would not be paid but for defendants' fraudulent underwriting and appraisal scheme.

177.    By reason of defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial. Through HUD and FHA, the United States has paid scores of claims, potentially amounting to at least hundreds of millions of dollars, for false or fraudulent insurance claims made as a result of false, inflated appraisals.

COUNT II

FALSE CLAIMS ACT CONSPIRACY

31 U.S.C. § 3729(a)(3)

178.    Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 170 of this Complaint.

179.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

180.    Through the acts described above and otherwise, defendants entered into a conspiracy or conspiracies with each other and with unnamed co-conspirators to defraud the United States by getting false or fraudulent claims allowed or paid. Defendants have taken substantial steps in furtherance of those conspiracies, *inter alia*, by (a) knowingly and fraudulently inflating, and causing inflation of, property appraisals on, among others, FHA-backed loans, including for use as comparables for other FHA-backed loans; (b) refusing to supply *bona fide* appraisers with HUD-1 documents and other materials necessary for HUD-conforming appraisals; (c) paying above-market fees to those appraisers who inflate values above actual market values; (d) rewarding appraisers who produce appraisals and appraisal reviews at a rate of as many as 400 per month (an impossible volume to produce in conformity with federal law); (e) blacklisting, retaliating against, auditing, and firing appraisers who refuse to corrupt their appraisal reports by fraudulently inflating the value of homes in contravention of

- 47 -

federal law; (f) requiring appraisers to rely upon information outside the relevant market to justify inflated valuations in appraisals; (g) providing appraisers with false sales information, not reflecting concessions made by sellers at the time of closing, further corrupting the use of comparables to complete accurate appraisals; (h) allowing home developers to choose appraisers from an "approved list" of corrupted appraisers who will appraise at pre-determined values; (i) violating the loan-to-value rules under HUD, thereby forcing the Government to insure homes at values in excess of their actual market value with loan-to-value ratios in excess of 100%; (j) demanding reviews and reappraisals where those demands are made by persons other than the Direct Endorsement Underwriters (who were exclusively allowed to make such requests under law); (k) knowing and permitting the exchange and sharing of CHUMS identification numbers given to Direct Endorsement Underwriters, thereby allowing persons not authorized to communicate with appraisers to challenge the valuations in appraisal reports; and (l) retaliating against those persons who question or criticize the pattern and practice of defendants to require inflation of *bona fide* appraisals to meet an inflated loan amount where that inflated appraisal does not meet federal requirements and is simply the product of fraud and manipulation.

181.    The United States, unaware of defendants' conspiracies or the falsity of the records, statements, and claims made or caused to be made by defendants, and as a result thereof, have paid and continue to pay millions of dollars in mortgage insurance payments, among other expenses, that they would not otherwise have paid.

182.    By reason of defendants' conspiracies and the acts taken in furtherance thereof, the United States has been damaged in the amount of many millions of dollars.

### PRAYER

WHEREFORE, Relator prays for judgment against defendants as follows:

A.      That defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

B.      That this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions,

plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

        C.      That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

        D.      That Relator be awarded all costs of this action, including attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d); and

        E.      That the United States and Relator be granted all such other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury.

Dated: May 13, 2009

                        JONATHAN A. WILLENS, LLC

                        By: _____
                        Jonathan A. Willens (JW-9180)
                        Jonathan A. Willens, LLC
                        217 Broadway, Suite 707
                        New York, N.Y. 10007
                        Telephone: (212) 619-3749
                        Fax: (800) 879-7938

                        HAGENS BERMAN SOBOL SHAPIRO LLP
                        Steve W. Berman
                        Jeffrey T. Sprung
                        Thomas E. Loeser
                        Shayne C. Stevenson
                        1301 Fifth Avenue, Suite 2900
                        Seattle, WA 98101
                        Telephone: (206) 623-7292
                        Fax: (206) 623-0594

                        Attorneys for Plaintiff/Relator Kyle W. Lagow

- 49 -